# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

(1) KARL HOEPPNER, as Special )
Administrator of the Estate of MICHAEL )
JAMES HOEPPNER, deceased, )
                                                )
      Plaintiff, )
                                                )
v. )    Case No.:  20-cv-299-KEW
                                                )
(1) TONY HEAD, in his official capacity as )    Jury Trial Demanded
Sheriff of Atoka County, Oklahoma, )
(2) CITY OF TUSHKA, OKLAHOMA, )    Attorney's Lien Claimed
(3) CHARLES SANDERS, )
(4) CARRUS HEALTHCARE, LLC, and )
(5) ELIZABETH RAINS, RN, )
                                                )
      Defendants. )

## COMPLAINT

**COMES NOW**, Plaintiff Karl Hoeppner ("Plaintiff"), as the Special Administrator of the Estate of Michael James Hoeppner ("Mr. Hoeppner" or "Michael Hoeppner"), deceased, and for his causes of action against the above-named Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff Karl Hoeppner is a citizen of Wisconsin and the duly-appointed Special Administrator of the Estate of Michael James Hoeppner. Karl Hoeppner and Michael Hoeppner are brothers. The survival causes of action in this matter are based on violations of Michael Hoeppner's rights under the Fourth and Fourteenth Amendments to the United States Constitution.

2. Defendant Tony Head ("Sheriff Head" or "Defendant Head") is, and was at all times relevant hereto, the Sheriff of Atoka County, Oklahoma, residing in Atoka County, Oklahoma and acting under color of state law. Sheriff Head is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in

his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Head in his official capacity, Plaintiff has brought suit against Atoka County/Atoka County Sheriff's Office ("County" or "ACSO").

3. Defendant Charles "Buddy" Sanders ("Officer Sanders") was, at all times relevant hereto, acting under color of state law, and in the scope of his employment as a police officer for the City of Tushka, Oklahoma. Officer Sanders arrested Mr. Hoeppner on March 8, 2019 and transported him to the Atoka County Jail. Officer Sanders committed underlying violations of Mr. Hoeppner's Constitutional rights, explained below in more detail.

4. Defendant City of Tushka, Oklahoma is a municipality located in Atoka County, Oklahoma. The City provides and employs the Tushka Police Department ("TPD").

5. Defendant Carrus Healthcare, LLC d/b/a Carrus Health (hereinafter, "Carrus Health") is a Texas limited liability company doing business in Oklahoma. Carrus Health's principal place of business is in Sherman, Texas. Under contract with the Atoka County Healthcare Authority, Carrus Health staffs and operates the Atoka County Medical Center in Atoka, Oklahoma.

6. Defendant Elizabeth Rains, RN ("Nurse Rains") was at all times relevant hereto, an employee and/or agent of Carrus Health and an agent/ostensible agent of Atoka County, who was, in part, responsible for overseeing Mr. Hoeppner's health and well-being, and assuring that Mr. Hoeppner's medical/mental health needs were met. At all times pertinent, Nurse Rains was acting within the scope of her employment and under color of State law. Nurse Rains is being sued in her individual capacity.

7. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth and/or Fourteenth Amendments to

the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

8. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

9. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367, since the claims form part of the same case or controversy arising under the United States Constitution and federal law.

10. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

11. Paragraphs 1-10 are incorporated herein by reference.

■ **Introductory Statement**

12. On or about March 8, 2019, at approximately 8:50 a.m., Michael James Hoeppner ("Mr. Hoeppner"), a long-haul truck driver from Wisconsin, was driving a refrigerated truck northbound on U.S. Route 69 in Tushka, Oklahoma when Tushka Police Department ("TPD") Officer Charles "Buddy" Sanders initiated a traffic stop.

13. Atoka County dispatch had informed Officer Sanders that a truck that fit the description of Mr. Hoeppner's vehicle had been driving erratically, so Officer Sanders initiated the stop on the belief that Mr. Hoeppner was potentially under the influence of alcohol and/or drugs.

14. Mr. Hoeppner, a 60-year-old man with no criminal history, was not, however, under the influence of any intoxicating substance.

15. Instead, he was suffering from a severe and debilitating case of pneumonia.

16. Despite Mr. Hoeppner's truthful statements that he was sober and suffering from an illness, Officer Sanders arrested Mr. Hoeppner and, after taking him to the Atoka County Medical Center for sobriety tests, transported him to the Atoka County Jail ("Jail") where he was booked on charges of improper lane use and driving under the influence of drugs.

17. Mr. Hoeppner was left to languish and suffer at the Jail in immense pain.

18. As his condition rapidly and obviously deteriorated, Jail personnel provided no medical attention whatsoever.

19. Less than 24-hours later, Mr. Hoeppner was dead.

20. The Medical Examiner determined his cause of death to be acute bronchopneumonia secondary to influenza, which, while serious, are common illnesses that are eminently treatable.

21. Mr. Hoeppner spent his last hours alone, suffering and dying, in a jail cell 1000 miles from his family.

■ **Facts Specific to Michael James Hoeppner**

22. Officer Sanders's body camera captured the events from the time he approached Mr. Hoeppner's truck[1] until he eventually dropped off Mr. Hoeppner at the Jail.

23. The footage shows that Officer Sanders asked Mr. Hoeppner to exit his truck and walk over to the side of the highway to get further away from traffic.

---

[1] The timestamp on Officer Sanders' body camera indicates that he pulled Mr. Hoeppner over shortly after 10:00 a.m. However, based on several other official documents listed and discussed, *infra*, such as Mr. Hoeppner's medical records from Atoka County Medical Center and his intake paperwork at the Atoka County Jail, it appears that the traffic stop actually occurred shortly after 9:00 a.m. It's possible that the inconsistencies with the time were caused by Daylight Saving Time, which began on Sunday, March 10, 2019.

24. Officer Sanders first told Mr. Hoeppner that he had stopped him because he had received "a whole bunch of 911 calls on [Mr. Hoeppner's] driving." Officer Sanders then asked Mr. Hoeppner why he was "driving like that."

25. Mr. Hoeppner shook his head, paused, and then replied that he was "just tired." Officer Sanders asked Mr. Hoeppner if he was on any medication, which Mr. Hoeppner denied.

26. Officer Sanders then asked Mr. Hoeppner to perform field sobriety tests, but never mentioned performing a breathalyzer on Mr. Hoeppner. Indeed, it was obvious that he was not under the influence of alcohol.

27. Mr. Hoeppner was asked to perform three field sobriety tests. He was unable to complete the tests due to his severe illness. Mr. Hoeppner almost fell over when being asked to stand on one foot, and could not take more than one step forward without stumbling.

28. Mr. Hoeppner's speech, however, was clear and cognizant, indicating that his fatigue and balance issues were likely not caused by an intoxicant. Shortly thereafter, Officer Sanders arrested Mr. Hoeppner, without incident, for allegedly driving under the influence of drugs.

29. On the way to the police cruiser, Officer Sanders asked Mr. Hoeppner if he had any "physical disabilities." Mr. Hoeppner stated that he used a continuous positive airway pressure ("C-PAP") machine and that he used to take medicine for high cholesterol.

30. Officer Sanders left Mr. Hoeppner handcuffed in the back of his police car and indicated that he was going to go search Mr. Hoeppner's truck. Mr. Hoeppner remarked that the handcuffs were too tight and hurting his wrists, and Officer Sanders replied that Mr. Hoeppner would just have to "try to get comfortable."

31. Officer Sanders found absolutely no contraband in the truck, although he did recover Prilosec, which is commonly used for heartburn and indigestion, and Fenofibrate, a medication used to treat high cholesterol.

32. When Officer Sanders returned to the police car, he asked Mr. Hoeppner if he had taken any kind of medication. Mr. Hoeppner again denied having taken anything and explained that he was sick.

33. A couple of minutes later, a tow truck arrived to tow Mr. Hoeppner's vehicle. Officer Sanders explained the situation to the tow truck driver, whom he appeared to know personally. Officer Sanders remarked several times that Mr. Hoeppner was "definitely on something," obviously having already made up his mind with no evidence other than Mr. Hoeppner's poor physical condition.

34. Officer Sanders also declared that, incredibly, it would take "a minimum of 30 days" to get a result on Mr. Hoeppner's toxicology screen.

35. Officer Sanders then transported Mr. Hoeppner to the Atoka County Medical Center ("Hospital").

36. In the Hospital parking lot, Mr. Hoeppner almost fell over because he was so weak and exhausted. Officer Sanders asked, "[w]hy are you staggering around so much if you're not taking anything?"

37. Mr. Hoeppner replied, "[w]ell, *I had Leukemia, and I am sick right now.*"

38. Instead of further inquiring about Mr. Hoeppner's increasingly obvious illness, Officer Sanders ignored the response and escorted Mr. Hoeppner into the Hospital for the toxicology screen.

39. According to the medical records, Mr. Hoeppner arrived at the emergency room at 9:44 a.m. During the intake process, Officer Sanders asked Mr. Hoeppner if he was going to get sick to his stomach, seemingly acknowledging Mr. Hoeppner's illness.

40. Mr. Hoeppner failed to respond verbally, but shrugged his shoulders. While waiting to have his blood drawn, Mr. Hoeppner began to wheeze and had trouble catching his breath.

41. Nurse Rains proceeded to take Mr. Hoeppner's vital signs and drew blood for a toxicology screen. With negligence and deliberate indifference, Nurse Rains did not take or record Mr. Hoeppner's medical history.

42. Mr. Hoeppner's vitals, both individually and collectively, were alarming to the degree that it should have been obvious, to Nurse Rains, that he immediately needed assessment by a doctor. His blood pressure, 102/63, bordered on dangerously low. His pulse of 113 beats per minute was well above normal range, constituting tachycardia. And his oxygen saturation of 90% was low, indicating a lack of oxygen in the vital body tissues.

43. Nurse Rains negligently failed to take Mr. Hoeppner's temperature.

44. In the medical record from the Hospital, to the extent there is a record, Nurse Rains made no comment with respect to Mr. Hoeppner's concerning vital signs.

45. The vital signs (though incomplete), coupled with Mr. Hoeppner's age, obvious fatigue, confusion, disorientation, shortness of breath and complaints that he was sick, signaled an emergent situation. Under these circumstances, it was obvious that Mr. Hoeppner needed immediate evaluation by a physician and treatment. It was obvious that Mr. Hoeppner was in no condition to be medically cleared for booking at the Atoka County Jail. Nurse Rains should have kept Mr. Hoeppner at the Hospital for evaluation by a physician and treatment. Instead, with negligence and deliberate indifference to Mr. Hoeppner's serious medical needs, Nurse Rains did not even attempt to have Mr. Hoeppner evaluated by a physician or admitted to the Hospital. Rather, she released Mr. Hoeppner back to Officer Sanders for transport to the Jail.

46. Before releasing Mr. Hoeppner, Nurse Rains told Officer Sanders that Mr. Hoeppner's blood pressure was "lower than normal." Based on his earlier report that he had suffered from Leukemia, his overt respiratory problems, confusion, disorientation and fatigue; and the report of low blood pressure, it would have been obvious, even to a layperson like Officer Sanders, that Mr.

7

Hoeppner needed emergent medical care. Instead of doing anything to assist Mr. Hoeppner, Officer Sanders replied to Nurse Rains, "okay," finished his paperwork, and took Mr. Hoeppner back to the police vehicle. This constitutes deliberate indifference to a serious medical need.

47. Inexplicably, no body camera footage appears after Officer Sanders loaded Mr. Hoeppner back into the car in the Hospital parking lot.

48. According to Atoka County Jail ("the Jail") records, however, Mr. Hoeppner was booked into the Jail at 10:23 a.m. According to Mr. Hoeppner's Jail intake form, he was booked by an Officer Smith.

49. Officer Smith utterly failed to conduct a proper medical intake screening process for Mr. Hoeppner, despite Mr. Hoeppner's increasingly obvious illness.

50. On information and belief, during the booking process, Mr. Hoeppner was confused, disoriented, fatigued, unsteady on his feet, dizzy, in respiratory distress and otherwise in obvious need of emergent medical attention.

51. Instead of getting Mr. Hoeppner medically cleared for booking by a qualified professional, Officer Smith simply placed him in a holding cell.

52. Officer Smith failed to place Mr. Hoeppner on protocols for allegedly intoxicated inmates or inmates with serious medical conditions; and failed to secure increased supervision for Mr. Hoeppner.

53. Officer Smith also failed to refer Mr. Hoeppner to a medical provider, and, upon information and belief, Mr. Hoeppner was never referred to a medical professional by any Jail staff on shift nor was he assessed or treated by any medical professional while he was detained at the Jail.

54. On information and belief, for many hours at the Jail, Mr. Hoeppner continued to display obvious signs of a serious and emergent medical need, including disorientation, confusion, fatigue, dizziness, loss of balance, shortness of breath, coughing, complaints of chest pain and nausea.

55. On information and belief, Mr. Hoeppner was not regularly monitored or supervised in the holding cell, during his time housed at the Jail, despite the precarious state of his health.

56. In deliberate indifference to his serious medical needs, staff at the Jail, including Officer Smith, disregarded the known, obvious and substantial risks to Mr. Hoeppner's health and safety.

57. Despite the fact that his symptoms and need for immediate medical treatment would be obvious, even to a layperson, Mr. Hoeppner was left alone in his cell until he finally succumbed to his illnesses less than 24 hours after being arrested.

58. The Medical Examiner who performed the autopsy on Mr. Hoeppner determined that he died of bilateral acute bronchopneumonia due to influenza viral infection.

59. Further, the Medical Examiner's report indicates that Mr. Hoeppner did *not* have any drugs or alcohol in his system at the time of his death.

## CAUSES OF ACTION

### I.

### VIOLATION OF THE FOURTEENTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES (42 U.S.C. § 1983)

**A. Officer Sanders**

60. Paragraphs 1-59 are incorporated herein by reference.

61. Mr. Hoeppner had medical needs that were sufficiently serious, objectively, to be of a Constitutional dimension.

62. Mr. Hoeppner had serious medical needs that were known or obvious.

63. As described above, Officer Sanders knew -- or it was obvious -- that Mr. Hoeppner was at substantial risk of serious harm.

64. Officer Sanders disregarded these known and obvious risks in deliberate indifference to Mr. Hoeppner's serious medical needs.

65. It was obvious that Mr. Hoeppner needed an immediate and emergent medical evaluation and treatment from a physician, but such services were denied, delayed and/or obstructed.

66. Under the circumstances, Officer Sanders had a duty and obligation to assure that Mr. Hoeppner received treatment or access to medical personnel capable of evaluating the need for treatment. He did neither, in deliberate indifference to Mr. Hoeppner's serious medical needs.

67. Officer Sanders was also deliberately indifferent under a purely objective standard of liability. That is, Officer Sanders did not take reasonable available measures to abate the obvious risk of substantial harm to Mr. Hoeppner.

68. As a direct and proximate result of this deliberate indifference, as described above, Mr. Hoeppner experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

69. As direct and proximate result of Officer Sanders' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Mr. Hoeppner's rights secured by the U.S. Constitution.

**B.  Nurse Rains**

70. Paragraphs 1-59 are incorporated herein by reference.

71. As described *supra*, Nurse Rains knew, or it was obvious, that there were substantial risks to Mr. Hoeppner's health and safety.

72. Mr. Hoeppner had serious medical needs that were known or obvious.

10

73. As described *supra*, Mr. Hoeppner had serious and emergent medical issues that were known and obvious to Nurse Rains. It was obvious that Mr. Hoeppner needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and obstructed.

74. Nurse Rains provided Mr. Hoeppner with no medical assistance in the face of his obvious, significant and emergent needs.

75. Nurse Rains disregarded the known, obvious and substantial risks to Mr. Hoeppner's health and safety.

76. Nurse Rains was also deliberately indifferent under a purely objective standard of liability. That is, Nurse Rains did not take reasonable available measures to abate the obvious risk of substantial harm to Mr. Hoeppner.

77. As a direct and proximate result of this deliberate indifference, as described above, Mr. Hoeppner experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

78. As direct and proximate result of Nurse Rains' conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Mr. Hoeppner's rights secured by the U.S. Constitution.

**C.    Jail Staff/Underlying Violations**

79. Paragraphs 1-59 are incorporated herein by reference.

80. The Jail staff,[2] including the booking officer, Smith, knew -- or it was objectively obvious -- that there were substantial risks to Mr. Hoeppner's health and safety.

---

[2]    Hereinafter, "Jail staff" refers to all employees and/or agents of the Atoka County Jail, including any Jail medical staff, on duty during Mr. Hoeppner's period of incarceration.

11

81. Mr. Hoeppner had serious medical needs that were known or obvious.

82. As described *supra*, Mr. Hoeppner had serious and emergent medical issues that were known and/or obvious to the Jail staff including Officer Smith. It was obvious that Mr. Hoeppner needed immediate and emergent evaluation and treatment from a physician, but such services were denied, delayed and/or obstructed. Indeed, Mr. Hoeppner was left to languish in a cell for over 24 hours, despite his obvious and serious medical needs. Jail staff, including Officer Smith, disregarded the known, obvious and substantial risks to Mr. Hoeppner's health and safety.

83. Under the circumstances, Jail staff, including Officer Smith, had a duty and obligation to assure that Mr. Hoeppner received treatment or access to medical personnel capable of evaluating the need for treatment. They did neither, in deliberate indifference to Mr. Hoeppner's serious medical needs.

84. Jail staff, including Officer Smith, were also deliberately indifferent under a purely objective standard of liability. That is, Jail staff, including Officer Smith, did not take reasonable available measures to abate the obvious risk of substantial harm to Mr. Hoeppner.

85. As a direct and proximate result of this deliberate indifference, as described above, Mr. Hoeppner experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

86. As direct and proximate result of Jail staff's conduct, Plaintiff is entitled to pecuniary and compensatory damages. Plaintiff is entitled to damages due to the deprivation of Mr. Hoeppner's rights secured by the U.S. Constitution.

### C. Official Capacity Liability (Against Sheriff Head)

87. Paragraphs 1-59 and 79-86 are incorporated herein by reference.

88. The County/ACSO/Sheriff Head failed to provide constitutionally sufficient medical

training and supervision to Jail staff for the assessment, evaluation, and treatment of serious medical conditions.

89. The aforementioned acts and/or omissions of Jail staff in being deliberately indifferent to Mr. Hoeppner's health and safety and violating Mr. Hoeppner's civil rights are causally connected with customs, practices, and policies which the County/ACSO/Sheriff Head promulgated, created, implemented and/or possessed responsibility for.

90. Such policies, customs and/or practices include, but are not limited to:

   a. A failure to train Jail staff on how to conduct a proper medical intake for newly booked inmates;

   b. A failure to train Jail staff on how to recognize and respond to an inmate's emergent medical condition;

   c. A failure to train Jail staff to ensure that arrestees arriving to the Jail exhibiting signs of suffering from an obvious and serious medical condition or intoxication, like Mr. Hoeppner, are properly cleared by a medical professional for booking into the Jail;

   d. A practice of failing to adequately assess and treat – and ignoring and disregarding – obvious or known symptoms of emergent and life-threatening conditions;

   e. A failure to refer inmates with obviously serious medical conditions to outside medical professionals;

   f. An utter lack of physician supervision over the clinical care provided to inmates;

   g. An utter failure to supervise the medical care and monitoring of inmates with serious medical conditions;

   h. A failure to staff the Jail with personnel capable of assessing, evaluating or treating the serious medical needs of inmates like Mr. Hoeppner;

  i. A failure to properly monitor and supervise inmates who are locked in their cells, particularly those with obviously serious medical conditions or those thought to be under the influence of alcohol and/or drugs; and

  j. A practice of minimizing costs at the expense of inmate medical care.

91. Pursuant to the polices, customs, and/or practices listed above, Mr. Hoeppner: was not medically cleared before being booked into the Jail, did not receive an adequate medical intake, was not placed on any protocols that would ensure he was monitored more closely due to suffering from a serious medical condition, was never seen by *any* medical professional while he was at the Jail, and was not referred to an outside medical provider, despite his obvious symptoms of a serious medical condition.

92. The risks to inmates like Mr. Hoeppner presented by the maintenance of such a deficient medical delivery system were substantial and obvious such that County/ACSO/Sheriff Head should have known them.

93. The County/ACSO/Sheriff Head failed to take reasonable measures to alleviate those risks.

94. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Hoeppner suffered injuries and damages as alleged herein.

### D. Municipal Liability (City of Tushka)

95. Paragraphs 1-69 are incorporated herein by reference.

96. There is an affirmative link between the deprivation of Mr. Hoeppner's constitutional rights and TPD policies, practices and/or customs which the City of Tushka promulgated, created, implemented and/or possessed responsibility for.

97. On information and belief, TPD/the City of Tushka has utterly failed to train and supervise TPD officers with respect to recognizing the signs and symptoms of serious medical conditions.

98. On information and belief, TPD/the City of Tushka has utterly failed to train and supervise TPD officers in how to protect arrestees with serious medical conditions from harm.

99. On information and belief, TPD/the City of Tushka has utterly failed to train and supervise TPD officers on how to distinguish the symptoms of drug and/or alcohol intoxication with the symptoms of a serious medical condition.

100. On information and belief, TPD/the City of Tushka has utterly failed to train and supervise TPD officers to ask medical personnel that conduct toxicology screens on arrestees suspected of being under the influence to check for any underlying conditions, even when the arrestee, like Mr. Hoeppner, has symptoms of a medical condition and/or reports being sick.

101. On information and belief, TPD/the City of Tushka has utterly failed to train and supervise TPD officers on when to transport arrestees to an outside medical provider to receive treatment for a serious medical condition.

102. TPD/the City of Tushka should have known that this failure to train and supervise was substantially certain to result in Constitutional violations.

103. The failure to train and supervise provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and were also moving forces behind the violation of Mr. Hoeppner's civil rights and the resulting injuries alleged herein.

104. As direct result of Officer Sanders'/the City's conduct, Mr. Hoeppner suffered serious actual physical and emotional injuries, death, and other damages and losses as described herein entitling Plaintiff to pecuniary and compensatory damages in amounts to be determined at trial. Plaintiff is entitled to damages due to the deprivation of Mr. Hoeppner's rights secured by the U.S. Constitution.

**II.**

**WRONGFUL ARREST IN VIOLATION OF THE FOURTH AND/OR FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)**
**(Against Officer Sanders)**

105. Paragraphs 1-59 are incorporated herein by reference.

106. In determining the existence of probable cause, Courts are required to include exculpatory evidence that was omitted or suppressed by law enforcement.

107. When one considers the evidence that was omitted, ignored or suppressed by Defendant Sanders, there was plainly no probable cause for the arrest of Mr. Hoeppner.

108. Officer Sanders observed no odor of alcohol or drugs on Mr. Hoeppner and failed to uncover any evidence of drugs and/or alcohol in Mr. Hoeppner's truck. In contrast to Officer Sanders' conduct, Mr. Hoeppner outwardly displayed signs of a serious medical condition – and even told Officer Sanders that he was sick and had a history of leukemia – yet the Officer arrested him in the absence of probable cause.

109. This wrongful arrest lacked probable cause, as required by the Fourth Amendment, as applied to the States by the Fourteenth Amendment. This wrongful arrest violated Mr. Hoeppner's Fourth Amendment right to be secure against unreasonable seizure and violated Mr. Hoeppner's Fourth Amendment-protected sense of security and individual dignity.

110. This wrongful arrest was a proximate cause of Mr. Hoeppner's prolonged imprisonment, exacerbated physical injuries, emotional distress, pain and suffering, ultimate death, and the damages as alleged herein.

## III.

## NEGLIGENCE
## (GTCA)
## (CITY OF TUSHKA)[3]

111. Paragraphs 1-69 are incorporated herein by reference.

112. Officer Sanders owes a duty to arrestees/detainees, including Mr. Hoeppner, to use reasonable care to assure those arrestees/detainees in need of medical attention, like Mr. Hoeppner, are provided with appropriate and timely medical attention.

113. Officer Sanders breached that duty by wholly failing to assure that Mr. Hoeppner received prompt and adequate medical treatment of his obvious medical needs.

114. As a direct and proximate cause of Officer Sanders' negligence, Mr. Hoeppner experienced physical pain, severe emotional distress, mental anguish, and the damages alleged herein.

115. At all pertinent times, Officer Sanders was acting within the scope of his employment as a Tushka police officer.

116. The City of Tushka is vicariously liable for the negligence of its employees and agents, acting within the scope of their employment, including Officer Sanders.

117. As a direct and proximate cause of the negligence alleged herein, Mr. Hoeppner suffered real and actual damages, mental and physical pain and suffering, emotional distress, lost wages and other damages in excess of $75,000.00.

---

[3] Prior to filing this action, Plaintiff gave proper notice of his tort claim, as required by 51 Okla. Stat. § 156.  In addition, this action is timely filed within 180 days of the denial of Plaintiff's tort claim, as required by 51 Okla. Stat. § 157.

## IV.

## NEGLIGENCE/MEDICAL MALPRACTICE
## (NURSE RAINS & CARRUS HEALTH)

118. Paragraphs 1-59 are incorporated herein by reference.

119. Nurse Rains and Carrus Health owed Mr. Hoeppner a duty of reasonable care, measured by the standard of care for nurses encountering a patient presenting with Mr. Hoeppner's symptoms, needs and condition.

120. Nurse Rains violated and breached the standard care as described herein.

121. Nurse Rains breached the duty of care owed to Mr. Hoeppner by, *inter alia*: failing to secure immediate and emergent evaluation and treatment from a physician; failing to take a full set of vital signs; failing to provide any medical assistance to Mr. Hoeppner; allowing Mr. Hoeppner to be taken to Jail without first being evaluated by a physician and without providing any medical assistance.

122. As a direct and proximate result of this negligence, as described above, Mr. Hoeppner experienced unnecessary physical pain, a worsening of his condition, severe emotional distress, mental anguish, lost wages, a loss of quality and enjoyment of life, terror, degradation, oppression, humiliation, embarrassment, and death.

123. Carrus Health is vicariously liable for Nurse Rains' negligence.

**WHERFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen

Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@ssrok.com
bobblakemore@ssrok.com
bryondhelm@ssrok.com

***Attorneys for Plaintiff***