# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KARL HOEPPNER, as Special
Administrator of the Estate of MICHAEL
JAMES HOEPPNER, deceased,

       *Plaintiff,*

 vs.

                                    Case No. CV-20-299-RAW

TONY HEAD, in his official capacity as
Sheriff of Atoka County, Oklahoma, *et al*.

       *Defendants.*

## MEMORANDUM AND ORDER

Michael Hoeppner died tragically due to bilateral acute bronchopneumonia less than 24 hours into his detention in the Atoka County, Oklahoma Jail.  Plaintiff Karl Hoeppner, as Special Administrator of Michael's Estate, brought this lawsuit against (1) Sheriff Tony Head of Atoka County, (2) the arresting officer Charles Sanders, Chief of the City of Tushka Police Department, (3) the City of Tushka itself ("the City"), (4) Carrus Healthcare LLC, and (5) Elizabeth Rains, RN, who performed a blood draw on Michael while he was in Atoka County Medical Center.[1]  Plaintiff brings claims under 42 U.S.C. § 1983 for alleged violations of Michael's Fourteenth and Fourth

---

[1] Carrus Healthcare was dismissed from this case without prejudice (Doc. 54).  The Court granted summary judgment to Nurse Rains (Doc. 140).

Amendment Rights, as well as a claim of negligence against the City of Tushka under the Oklahoma Governmental Tort Claims Act.

Defendants move for summary judgment as to all claims against them. Because no reasonable jury could find that Defendant Sanders was deliberately indifferent to Plaintiff's serious medical needs, or that he violated Michael's Fourth Amendment rights, the Court grants him summary judgment. The City likewise is entitled to summary judgment, because there was no underlying constitutional violation by Sanders and because there is insufficient evidence to support Plaintiff's negligence claim. But Defendant Head is not entitled to summary judgment—a reasonable jury could find an underlying constitutional violation by the County jailers and that County policies, practices or customs were the moving force behind the violation.

## I.     Factual and Procedural Background[2]

Michael Hoeppner was a long-haul truck driver who drove five or six days per week all over the country from a base in Wisconsin. On March 8, 2019, Michael was driving his tractor-trailer from Texas to Wisconsin. While Michael passed through the City of Tushka, Oklahoma in Atoka County, several other motorists observed him driving erratically. His speed was approximately 20 miles per hour under the posted limit, he drove on the shoulder and weaved back across several lanes of traffic, and generally caused a backup in traffic. Several drivers called 911 after witnessing this behavior.

## A.     The Traffic Stop

Chief of Tushka Police Charles Sanders, while out on patrol, learned of the 911 calls from dispatch. He quickly spotted Michael's tractor trailer and observed the same erratic driving that

---

[2] In accordance with summary judgment procedures, the Court has laid out the uncontroverted material facts in the light most favorable to the non-moving party, the Plaintiff.

had been reported by the 911 callers—the tractor trailer weaving in and out of lanes of traffic, maintaining a speed well under the limit, and driving on the shoulder.  Chief Sanders pulled Michael over at approximately 8:50 a.m. and had him step out of the cab.

When Chief Sanders first asked Michael why he was driving erratically, he responded "I'm just . . . I'm just tired."  Chief Sanders noted that Michael was slow in his movements and in responding to questions.  Michael initially informed Chief Sanders that he was not taking any medications.

Chief Sanders administered several field sobriety tests to Michael during the traffic stop. The first is known as a "nystagmus test."  In this test, an officer will ask a suspect to follow the point of a pen with their eyes from side to side, while not moving their head.  If the suspect's eyes "jerk" from one side to another, this indicates the presence of alcohol in the suspect's system. Chief Sanders stated that he was not able to observe any nystagmus in Michael's response.  As to the other tests, the cited evidence does not support Defendants' statement that Michael "failed" these sobriety tests.  Rather, it is more accurate to say, as they later do, that he was unable to complete the tests.  Michael had noticeable difficulty maintaining his balance.  He almost fell over when asked to stand on one foot for several seconds and could not take more than one step without stumbling.  Chief Sanders placed Michael in handcuffs after his inability to complete these two tests.

While walking Michael back to his police cruiser, Chief Sanders asked if he had any physical disabilities.  Michael was once again slow in responding.  He stated that he used a C-PAP machine but had no disabilities.  Michael also informed Chief Sanders that he was taking medication for cholesterol.  Chief Sanders placed Michael in the back of his cruiser, at which point

Michael can be seen coughing on Chief Sander's bodycam footage before the door is closed. There is at least one more time when Michael can be heard coughing on the footage.

In the cruiser, Chief Sanders again inquired if Michael was having any physical problems. Michael responded that he was "sick." Chief Sanders persisted and asked "how come you're so staggery and slow speech and stuff" to which Michael responded "I don't know." Michael appeared confused and disoriented at times. Plaintiff's expert, Dr. Susan Tiona, M.D., opined that this confusion is consistent with low blood oxygen levels. Dr. Tiona also testified that, during Michael's interaction with Chief Sanders, there were two instances where he exhibited a high respiratory rate—around 40 breaths per minute—"to the point that a layperson would know he had hyperventilation."

Chief Sanders conducted a search of the cab of Michael's tractor trailer. He did not find any alcohol or drugs in the cab. Chief Sanders admits that he never smelled alcohol on Michael at any point in their interaction.

Chief Sanders informed Michael that he had been placed under arrest based on suspicion that he was driving while under the influence of intoxicants. Chief Sanders asked Michael if he would consent to a blood test, which Michael did. He then transported Michael to the emergency room at Atoka County Medical Center for a blood draw.

## B.   Atoka County Medical Center

Michael and Chief Sanders arrived at the emergency room of the Atoka County Medical Center at 9:44 a.m., approximately 54 minutes after the stop was initiated. Michael stumbled while getting out of the patrol car. Chief Sanders inquired why Michael was so unstable, to which he responded, "I had leukemia and I am sick right now." Dr. Tiona has testified that Plaintiff's past leukemia was unrelated to the condition that ultimately resulted in his death. Chief Sanders, for

his part, believed Plaintiff's statement that he was sick was merely an excuse to avoid arrest.  He did not inform anyone at Atoka County Medical Center that Michael stated that he was sick.

Two nurses saw Michael while he was in the emergency room: one was a licensed practical nurse and the other was Defendant Elizabeth Rains, a registered nurse.  Nurse Rains testified that she has a duty, as a registered nurse, to advocate for patient care and evaluate whether a person in the emergency room should be evaluated by a physician based on their presentation.

Nurse Rains received permission from Michael to draw blood.  She did so, noting that Michael presented with no signs of distress at that time.  She observed that his breathing was even and unlabored.  Michael's vitals (his blood pressure, heart rate, respiratory rate, and oxygen level) appeared to Nurse Rains to be "within the normal limits," other than his pulse, which she noted was "barely out of range."  Michael's blood oxygen saturations levels also appeared "a little low," at the time.

The results of the blood draw were not instantly available.  Rather, it was not until April that the Oklahoma State Bureau of Investigation Forensic Science Center issued a report indicating that Michael's blood tested negative for any intoxicants.

Dr. Tiona testified that had Michael received treatment for his underlying condition while at the Atoka County Medical Center, his odds of survival would have been 99%. But Michael did not stay at the medical center for treatment.  Instead, after the nurses were finished, Michael was transported to the Atoka County Jail.

**C.    Atoka County Jail**

*1.    Michael's Incarceration in Atoka County Jail*

Michael was initially booked into Atoka County Jail by Candace Smith.  Smith is an Assistant Jail Administrator for Atoka County Jail, as well as a certified nursing assistant ("CNA").

Smith testifies that she performed an initial medical screening on Michael during his book-in.[3] According to the Atoka County Jail Medical Screening sheet for Michael, he indicated that he did not have any respiratory problems, he did not need immediate attention, that he was not being treated for anything, and that he was neither under the influence of alcohol or drugs. Michael indicated to Smith that he was just very tired from driving for many hours and wanted to go lay down. Smith testified that Michael did not appear to be in any kind of distress at that time. Nor did she believe that he appeared intoxicated; "he just appeared to be tired." Dr. Tiona opines that Smith "should have seen something" was amiss with Michael's breathing at that time but recognizes that Smith "did not see anything that made her make a report to that effect."

After the initial book-in, Michael was transported to "Detox" because he was detained on a charge of driving under the influence. He was placed in Detox at 10:36 a.m. and stayed there alone until approximately 10:00 p.m. Smith testified that she monitored Michael with the video surveillance system until her shift ended at 4:00 p.m., and that he laid on the bed in Detox for the whole of that time. There is, however, no evidence that hourly sight checks were performed the entire time Michael was in Detox, per jail policy.[4]

When his time in detox had ended at 10:00 p.m., Michael was escorted by evening jailer Mick Nakanashi to make a phone call. Michael informed Nakanashi that he could not remember

---

[3] Plaintiff purports to dispute this fact, and the subsequent facts, because it is self-serving and the only other witness to the event—Michael—is deceased. This is not sufficient to controvert these facts. *See White v. City of Topeka*, 489 F. Supp. 3d 1209, 1215 (D. Kan. 2020) ("Nevertheless, self -serving testimony is 'competent' evidence to establish summary judgment facts.") (further citation omitted).

[4] Defendant Head cites to a document that contains a collection of what are apparently sight check logs. Only a few of these sheets are dated, and none bear the date of March 8, 2022. And even if the Court were to assume the second to last document is for March 8, 2022, as Defendant appears to expect of the Court, seven hours on that sheet are not initialed by a jailer to indicate a sight check had been performed.

any phone numbers to make a call. At approximately 10:11 p.m., Michael was escorted to the DOC pod for the night and walked there under his own power.

The DOC pod housed five other inmates that evening. One inmate, Shannon Davis, approached Michael and spoke to him at 11:40 p.m. Davis stated that Michael complained of being cold and "had funny breathing." Davis did not inform any of the jail staff about any concerns about Michael. Another inmate, Dennis Teague, has had, at different times, completely different recollections of that evening. Initially, Teague recalled that:

> Mr. Hoeppner was ill from the time I first saw him in the Atoka County Jail until he died. I could tell that Mr. Hoeppner was not drunk at all and was simply just very ill. When he would attempt to speak, he could barely do so and it took multiple breaths for him to get a sentence out. I beat on the glass for a guard to pay attention to Mr. Hoeppner. Once I got the guard's attention they told me he was drunk and to shut up about it. I called my mother and my grandfather from the Jail telephone to tell them what was happening to Mr. Hoeppner and how he needed help. I requested a medical form for Mr. Hoeppner from DO Mick Nakanashi on March 9, 2019. It was obvious Mr. Hoeppner was very ill and the guards were all aware of his conditions.

He submitted an affidavit to this effect and testified to these facts in his deposition. Teague, however, later recanted the entirety of that testimony. He then stated he could not tell if Michael was sick, that he never saw him have trouble breathing or speaking, that he did not beat on the glass to get a guard's attention, that he never made the calls or medical requests as he indicated he did, and that it was not obvious Michael was ill.

Teague did make several calls the morning after Michael's death to his mother and grandfather, in which he described Michael's breathing the previous night as "messed up." He informed his mother that Michael "was bad" and attempted to replicate the sound of Michael's breathing difficulties.

Night Jailer William Jackson arrived for his shift slightly before midnight. Jackson and Nakanashi went to the pod before Nakanashi left at around 11:45 p.m. Michael complained about being cold but did not want another blanket. Shortly thereafter, Michael laid in his bed and appeared to go to sleep. The parties dispute whether Jackson properly performed hourly sight checks that night.

At approximately 6:53 a.m. the next morning, the inmates woke up for breakfast. Michael did not get up, and when another inmate went to check on him, his face was blue, and he would not wake up. Jackson entered the pod and took Michael's pulse. Michael had no pulse. Jackson immediately advised the dispatcher to send Atoka County EMS.

EMTs Matison Stiles and Robert Daniels arrived within a few minutes. They saw that Michael was already deceased. Lividity and rigor mortis had set in, meaning Michael had already been dead for three to six hours. The narrative of the Atoka EMS report for this incident notes that "jailer stated that the pt [patient] was complaining of not feeling well last night and was having trouble breathing, this was dismissed by the jailer on duty." Daniels later clarified that he spoke to the morning jailer, who had received the aforementioned report from the night jailer.[5]

The medical examiner determined that Michael died of bilateral acute bronchopneumonia due to influenza viral infection. Dr. Tiona opined that "[b]ased on what I believe Mr. Hoeppner

---

[5] Defendant Head complains that this constitutes inadmissible hearsay. Summary judgment evidence need not be submitted in a form that would be inadmissible at trial, but the content or substance of the evidence must be admissible. *Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016), *as amended on reh'g* (2016). There appear to be four levels of hearsay here: Michael's statement to the night jailer, the night jailer's relaying of that statement to the morning jailer, the morning jailer's further relaying of that statement to the Daniels, and the report containing all of this. Michael's statement would be admissible under the exception for a statement made for medical diagnosis. Fed. R. Evid. 803(4). Both jailer's statements would be admissible as an opposing party's statement, specifically the statements of Defendant Head's agents or employees. *See* Fed. R. Evid. 801(d)(2)(D). And the report itself would be likely admissible under Fed. R. Evid. 803(6), assuming the proper foundation was laid. In sum, this is appropriate evidence to oppose summary judgment.

was presenting at the time he was in the jail, knowing how he presented before he got to the jail and knowing that his disease process was only going to get worse without treatment, I believe that anyone who had occasion to observe Mr. Hoeppner would have known that he was having respiratory difficulties and had a serious medical need."

  2.  *Atoka County Jail Policies, Procedures, and Customs*

  The Jail employs no physicians or trained medical personnel. Smith testified that she is a CNA, and therefore has been trained to take vital signs, dress wounds, and other basic care of patients such as bathing. Other than her, "nobody else" at the Jail had "a license to do anything." The Jail Administrator, Greg Munholland, admits that nobody at the Jail "was capable of performing any type of medical assessment." The Jail has a nurse practitioner visit weekly, on Thursdays, and is available for contact 24/7 if needed. Nakanashi, however, testified that the only medical personnel available for contact should an inmate experience health issues are Atoka County EMS. The Atoka County Jail Policy and Procedure Handbook appears to presume the presence of a "Facility Physician" in the Jail.

  During book-in, if an inmate needed medical attention, Jail policy was that the individual would not be booked-in but would rather be taken to the emergency room. Smith testified that the booking officer would use "common sense" to tell when someone needed medical attention. She elaborated that "you can look at someone and tell if they need medical attention because they're going to be telling you that they need medical attention." Jail Policy 1.05 provides that the booking officer is to "[a]sk whether prisoner has had or needs medical attention and observe prisoner for any physical or behavioral symptoms that require immediate medical attention." That same policy requires all inmates to complete a medical assessment or health history form, as Michael did in this case, before book-in was complete. Sheriff Head testified that this generally includes

"[a]sking them their medical history, if they've got any – any underlying issues, anything we need to be made aware of." If any of the inmate's answers on the medical assessment form raised concerns, such as high blood pressure, Smith testified that the booking officer would check on the issue and then send to the inmate to the emergency room if necessary. Similarly, if an inmate was experiencing serious breathing condition, Jail policy is that EMS would be contacted.

Once book-in is completed, any inmate with health concerns could request and fill out a medical request form. Munholland states that, once an inmate filled out a medical request form, the jailer would take it back to dispatch to "determine whether it was an emergency for or if it just needed an appointment set." The jailers would make this determination based, again, on "common sense."

As a general matter, the Atoka County Jail policy is that:

All County jail inmates shall be entitled to health care comparable to that available to citizens in the surrounding community. Medical care at the facility shall be delivered under the direction of a licensed physician and through the use of trained health care personnel. No Deputy or other employee *will ever summarily or arbitrarily deny* an inmate's request for medical services.[6]

Jail policy further provides that "[t]he Deputy on duty will conduct a tour of each cell (or other area where inmates are present) checking each inmate at least once every hour on an irregular schedule." Jail standards from the Oklahoma State Department of Health also require one visual sight check every hour. Records from the Oklahoma Jail Inspection Division show that the Atoka County Jail has repeatedly been cited for failure to comply with this policy.

As stated above, whenever an inmate presented with a serious medical issue, the Jail would contact Atoka County EMS. The EMS would come to the Jail and determine if the inmate needed

---

[6] Emphasis added.

to be transported to the emergency room, or if the inmate's issue could wait for a doctor's appointment at a later date.  There is one instance in the record where jailers called the EMS for an inmate complaining of chest pains but refused to allow EMS to transport the inmate to the emergency room.  They did so against medical advice.  A jailer transported this particular inmate to the emergency room for treatment approximately five hours later.  EMT Stiles testified that "this was not the usual situation," though it would happen "rarely."  Plaintiff cites other instances of conflict between the EMS and the jailers but, as discussed below, it is not necessary to delve into these at this time.

At the time of his deposition in this case, Sheriff Head had just begun the process of getting his jailers first aid and CPR certified, but other than that no jail staff has medical training (besides Smith, who the record clearly establishes is CNA certified).  Michael's death was the first inmate death to occur at Atoka County Jail.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law.[7]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[8]  The movant bears the initial burden of proof, though "a movant that will not bear the burden of persuasion at trial need not negate the nonmovant's claim."[9]    "Such a movant may make its prima facie

---

[7] Fed. R. Civ. P. 56(a).

[8] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006) (quoting *Bennett v. Quark, Inc.*, 258 F.3d 1220, 1224 (10th Cir. 2001)).

[9] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."[10]   The nonmovant must then bring forth "specific facts showing a genuine issue for trial."[11]   These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[12]   The Court views all evidence and draws "reasonable inferences therefrom in the light most favorable to the nonmoving party."[13]

### III.   Analysis

At issue are all claims against the three remaining Defendants in this case: Chief Sanders, the City of Tushka, and Sheriff Head.   Plaintiff claims Chief Sanders was deliberately indifferent to Michael's need for medical care, in violation of the Fourteenth Amendment, and arrested him without probable cause, in violation of the Fourth Amendment.   He seeks to hold the City of Tushka liable under a theory of municipal liability per 42 U.S.C. § 1983, and under the Oklahoma Governmental Tort Claims Act.   Plaintiff also seeks to impose § 1983 municipal liability on Sheriff Head in his official capacity.   The Court examines each in turn.

### A.   Chief Charles Sanders

#### 1.   *Fourteenth Amendment Deliberate Indifference to Need for Medical Care*

At the outset, Chief Sanders asserts the defense of qualified immunity.   Qualified immunity protects officials "from liability for civil damages insofar as their conduct does not violate clearly

---

[10] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (citing *Celotex Corp.*, 477 U.S. at 325).

[11] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005) (quoting *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999)).

[12] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (quoting *Adler*, 144 F.3d at 670-71).

[13] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004) (quoting *N. Tex. Prod. Credit Ass'n v. McCurtain Cnty. Nat'l Bank*, 222 F.3d 800, 806 (10th Cir. 2000)).

established statutory or constitutional rights of which a reasonable person would have known."[14] Once this defense is asserted, the plaintiff "bears a heavy two-part burden."[15]  Plaintiff must show that "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established at the time of the violation."[16]

a.    Constitutional Violation

"Courts have long held that a prison official's deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment."[17]   The same protection applies to pre-trial detainees, like Michael.[18] Plaintiff's claim for under the Fourteenth Amendment thus relies on the two-part Eight Amendment inquiry into whether an official has been deliberately indifferent to a pre-trial detainee's serious medical needs.[19]   This test provides for both an objective and subjective inquiry.[20]

i.    *Objective Inquiry*

The objective inquiry asks whether "the harm suffered rises to a level sufficiently serious to be cognizable under the Cruel and Unusual Punishment Clause of the Eighth Amendment."[21] The Tenth Circuit has made clear that a plaintiff may meet his burden on the objective inquiry in

---

[14] *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

[15]  *Archuleta v. Wagner*, 523 F.3d 1278, 1283 (10th Cir. 2008) (further citation and quotations omitted).

[16] *Quintana v. Santa Fe Cnty. Bd. of Comm'rs*, 973 F.3d 1022, 1028 (10th Cir. 2020).

[17] *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022)

[18] *Id.*

[19] *Quintana*, 973 F.3d at 1028.

[20] *Id.* at 1028-29.

[21] *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (citations and internal quotation marks omitted).

two ways.  First, a harm is "sufficiently serious" if "the condition has been diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention."[22]  Second, even if the plaintiff's symptoms standing alone are not sufficiently serious, he may rely on the "intermediate harm" analysis to show that the a sufficiently serious "resulting harm," such as death, was caused by the failure to treat his intermediate symptoms.[23]

Plaintiff fails to establish either of these avenues of satisfying the objective inquiry. Plaintiff's symptoms, standing alone, were not "so obvious that even a lay person would easily recognize the need for a doctor's attention."  To make this showing Plaintiff relies, in part, on the fact that (1) Chief Sanders did not smell alcohol on Michael, (2) the nystagmus test did not indicate the presence of alcohol, (3) a search of Michael's truck yielded no evidence of narcotics or alcohol, and (4) Michael told Chief Sanders he was not under the influence of any intoxicating substances. Based on these facts, Plaintiff essentially asks the Court to make the inference that Chief Sanders affirmatively knew Michael was not under the influence of any intoxicating substances.  And with this possibility was ruled out, Michael's behaviors—his lack of balance, slow speech and response time, confusion and disorientation—were "obvious" signs that he needed a doctor's attention. Leaving aside that this seems to be more in line with the subjective inquiry, the Court does not find this to be a reasonable inference.   Several indicators that Michael might not be intoxicated does not warrant the inference that Chief Sanders *knew* he was not intoxicated.  This is especially true given that Chief Sanders had other indicators that Michael *might be* intoxicated, such as his

---

[22] *Prince*, 28 F.4th at 1044 (quoting *Al-Turki v. Robinson*, 762 F.3d 1188, 1192-93 (10th Cir. 2014)).

[23] *Id.* at 1045 (citations omitted).

failure to complete two field sobriety tests.  Further, Michael's lack of balance, slow speech and response time, confusion and disorientation were not "obvious" signs that Michael was in distress because they are often indicative of intoxication rather than medical need.[24]

Nor were Michael's intermittent coughing and two instances of a high respiratory rate so "obvious that even a lay person would easily recognize the need for a doctor's attention."  No reasonable jury could conclude that, based on these bare symptoms visible to Chief Sanders, it would have been obvious that he needed immediate medical attention.  As a matter of law, intermittent coughing and high respiratory rates are not sufficiently serious harms to satisfy the objective component.  The same is true for Michael's admittedly *past* (and unrelated) leukemia and his use of a C-PAP machine.

The "intermediate harm" analysis does not yield a more favorable result for Plaintiff.  Though Plaintiff's "resulting harm"—death—is obviously serious, he has not presented evidence that Michael's symptoms "became lethal as a result of the delay in providing medical attention."[25]  Only 54 minutes passed between Chief Sander's initial detention of Michael during the traffic stop and the visit to the Atoka County Medical Center.  And while Plaintiff bemoans that this visit was for the purpose of a blood draw, and not to seek emergency care for Michael, the fact remains that it was still medical attention.  Plaintiff's expert opined that Michael would have had a 99% chance of survival had the nurses decided to keep him at the medical center for further treatment.  Michael's symptoms did not become lethal as a result of Chief Sander's delay in providing him

---

[24] *Quintana*, 973 F.3d at 1029 (" '[C]haracteristics . . . common to many intoxicated individuals' do not present an 'obvious' risk.") (further citation omitted).

[25] *Prince*, 28 F.4th at 1045.

with medical attention.  Plaintiff therefore fails the objective inquiry of the Eight Amendment deliberate indifference test.

ii. <i>Subjective Inquiry</i>

The subjective component of the Eighth Amendment analysis requires the Court to consider "evidence of the prison official's culpable state of mind," specifically whether this evidence establishes the official knew of and disregarded "an excessive risk" to the plaintiff's health or safety.[26]  Actual knowledge is required; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[27]  A defendant's knowledge can be inferred from circumstantial evidence.[28]

The uncontroverted evidence does not support a conclusion that Chief Sanders knew of an excessive risk to Plaintiff's health or safety.  Again, Plaintiff asks the Court to draw the unsupported inference that Chief Sanders affirmatively knew Michael was not intoxicated. Assuming this, Chief Sanders had no alternative explanation for Michael's confusion, disorientation, lack of balance, and slowness in movement and response to questions, and therefore must have known that these symptoms showed Michael was at a serious risk of harm.  The Court again declines Plaintiff's invitation to draw this inference, as it is not a reasonable one.  The fact that there was no smell of alcohol on Michael, that no evidence of intoxicants was found in his truck, and that one field sobriety test did not indicate the presence of alcohol does not support the inference that Chief Sanders knew Michael was not intoxicated, especially given that Michael

---

[26] *Id.* (citing *Mata*, 427 F.3d at 751).

[27] *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

[28] *DeSpain v. Uphoff*, 264 F.3d 965, 975 (10th Cir. 2001).

exhibited characteristics consistent with intoxication and was unable to complete other tests because of his lack of balance.

Because the evidence does not support a conclusion that Chief Sanders knew Michael was sober, it cannot be said that he knew Michael's lack of balance, slow speech and response time, confusion, and disorientation were indicative of an "excessive risk" to his health or safety.  Chief Sanders reasonably could have (and did) attribute these behaviors to suspected intoxication.[29]

Nor do Michael's complaints that he was "sick," or his intermittent coughing and high respiratory rate, establish that Chief Sanders knew of an excessive risk of death—specifically, death due to bilateral acute bronchopneumonia.  A complaint of being "sick" is far too general— while also being a symptom intricately tied to intoxication—to have put Chief Sanders on notice that there was an *excessive* risk to Michael's health and safety, and intermittent periods of coughing and a high respiratory rate are far too common to have done so.

Even if the Court were to conclude that Chief Sanders knew Michael faced an excessive risk to his health or safety, the uncontroverted evidence makes clear that Chief Sanders did not disregard that risk by impeding Michael's access to medical care.  The Court is persuaded that Chief Sanders' position was analogous to that of a "gatekeeper" to medical care.[30]  A person who serves " 'solely . . . as a gatekeeper for other medical personnel capable of treating the condition' may be held liable under the deliberate indifference standard if she 'delays or refuses to fulfill that gatekeeper role.' "[31]

---

[29] *Martinez*, 563 F.3d at 1091 (noting that the plaintiff "exhibited characteristics that are common to many intoxicated individuals.").

[30] *Mata*, 427 F.3d at 751.

[31] *Id.* (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir.2000)).

Chief Sanders did not delay or refuse to fulfill such gatekeeping role.  Rather, within an hour of his initiation of the traffic stop, Chief Sanders transported Michael to the emergency room at Atoka County Medical Center.  Michael was brought to the emergency room primarily to have blood drawn, and while there was seen by two nurses, each of whom had a duty to advocate for patient care and evaluate whether Michael needed to be seen by a physician.  Nurse Rains did not conclude that Michael needed further care, as he did not appear to be in distress and his vitals were largely within a normal range.  Though Chief Sanders purpose in bringing Michael to the emergency room was to take a blood draw to determine Michael's blood alcohol level, he still fulfilled his gatekeeper roll by presenting Michael to medical professionals.

Plaintiff is incorrect that Chief Sanders failed in his gatekeeping roll by not disclosing Michael's statements that he was sick and had leukemia in the past.  As to the latter, Plaintiff's own expert has admitted that his past bout with leukemia is unrelated to the condition that caused his death.  And as to the former, a "gatekeeper" does not fail in their role by failing to pass along, to medical personnel, a general statement by the inmate or detainee that they are "sick."  In *Mata v. Saiz*, for instance, the Tenth Circuit held that a prison nurse, informed by the plaintiff that she was feeling chest pain, was "required to notify either a physician, physician assistant, or nurse practitioner of Ms. Mata's chest pain."[32]  The same is not necessarily true for general statements that the inmate or detainee believes they are sick.  By presenting Michael to two nurses, Chief Sanders gave Michael the opportunity to communicate his health concerns, and the nurses had the opportunity to view any signs of distress.  Michael chose not to communicate any concerns and

---

[32] *Id.* at 757.

the nurses did not find any signs of distress.  Chief Sanders fulfilled his gatekeeper role and did not disregard an "excessive risk" to Michael's health or safety.

Urging a contrary conclusion, Plaintiff relies on *Rife v. Oklahoma Department of Public Safety.*[33]  In *Rife*, the Court found that a reasonable jury could find that the defendant was subjectively aware of an excessive risk to the plaintiff's health and safety.[34]  The defendant was a state trooper who encountered the plaintiff while he was sitting on his motorcycle on the side of the road.[35]  The trooper recognized that plaintiff had likely been in a motorcycle accident.[36]  He also concluded that the plaintiff was high on pain medication and arrested him for public intoxication.[37]  The former conclusion was correct—the plaintiff had been in an accident and suffered a severe head injury—but the latter was incorrect.[38]

Ultimately, this case is inapposite.  The trooper in *Rife* knew of a highly likely, alternate cause for the plaintiff's symptoms—a head injury from a motorcycle accident.  He heard the plaintiff complain about specific symptoms, such as feeling "floaty," head and chest pain, and dried blood on his nose.  By contrast, there is no evidence here Chief Sanders knew of alternate causes for Michael's disorientation, confusion, and lack of balance other than suspected intoxication.  He heard Michael complain twice that he was "sick," but again such a feeling, without greater specificity, is also obviously consistent with intoxication and is not analogous to *Rife*, in which the plaintiff made specific complaints about pain.  Chief Sanders also heard

---

[33] 854 F.3d 637, 641 (10th Cir. 2017).

[34] *Id.* at 649.

[35] *Id.* at 643.

[36] *Id.* at 644.

[37] *Id.*

[38] *Id.* at 641.

intermittent coughing and two periods of Michael's high respiratory rate, which Dr. Tiona testified would have been obvious to a layperson, but these alone do not suggest Chief Sanders had even a remotely similar level of knowledge as the trooper in *Rife*.  Finally, and perhaps most crucially, Chief Sanders brought Michael to the emergency room, while the trooper in *Rife* took the plaintiff straight to jail.

The Court therefore concludes that the uncontroverted evidence shows that Chief Sanders neither knew of an excessive risk to Michael's health nor disregarded such risk.  No reasonable jury, based on the evidence presented, could conclude to the contrary.

        b.     Clearly Established Law

"The 'clearly established' prong of the qualified immunity analysis ensures that governmental actors are given fair warning that their conduct is unconstitutional before they are held liable for damages based on that conduct."[39]  A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as [the] plaintiff maintains."[40]  A previous decision need not be "materially factually similar or identical to the present case; instead, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."[41]  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in

---

[39] *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196 (10th Cir. 2010).

[40] *Id.* at 1196-97.

[41] *Thomas*, 765 F.3d at 1194 (quotation omitted).

-20-

the situation he confronted."[42]  Courts must be careful "not to define clearly established law at a high level of generality."[43]

Plaintiff largely cites to general statements of the law on deliberate indifference to an inmate or detainee's medical needs to establish that the right was clearly established.  Plaintiff's only attempt at some level of specificity is his citation to *Rife*.  As discussed above, though, the Court has already concluded that case is inapposite given the facts of this case.  Accordingly, the Court cannot find that Plaintiff has met his burden to show that the law was clearly established such that a reasonable officer would have known Chief Sander's conduct was unconstitutional.

    2.    *Fourth Amendment Arrest Without Probable Cause*

Plaintiff asserts Chief Sanders violated his Fourth Amendment right due to his "wrongful arrest," or arrest without probable cause.  Chief Sanders again raises the defense of qualified immunity.  To defeat qualified immunity on his wrongful arrest claim, Plaintiff had the burden at summary judgment to assert a violation of his Fourth Amendment rights.[44]  "A warrantless arrest is permissible when an officer 'has probable cause to believe that a person committed a crime.' "[45]  "Probable cause to arrests exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed."[46]

---

[42] *Id.* (quotation omitted).

[43] *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011).

[44] *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995).

[45] *Cortez v. McCauley*, 478 F.3d 1108, 1115 (10th Cir. 2007) (quoting *Romero*, 45 F.3d at 1476).

[46] *Id.* at 1116 (quoting *United States v. Valenzuela*, 365 F.3d 892, 896 (10th Cir.2004)

Plaintiff fails to meet his burden because the uncontroverted facts show that Chief Sanders had probable cause to arrest Michael. Plaintiff again trots out his persistent refrain that Chief Sanders knew Michael was not intoxicated. As already discussed, this inference is not reasonable, and the Court will not draw it.

Chief Sanders had reasonably trustworthy information, including his own observations, that led him to believe that Michael was operating his truck while intoxicated, in violation of Oklahoma law.[47] Several 911 calls reported Michael's truck was swerving across highway lanes and onto the shoulder. Chief Sanders himself observed this behavior. After initiating the traffic stop, Chief Sanders observed Michael had trouble maintaining his balance, was slow in speech and movement, and seemed confused and disoriented. These are several of the hallmarks of intoxication.[48] Michael was unable to complete several field sobriety tests because of his difficulty maintaining balance. Though Chief Sanders did not smell any alcohol on Michael or find any evidence of intoxication in his truck, probable cause does not require certainty that the suspect has violated the law,[49] or even that such violation is more likely than not.[50] And though Plaintiff offers an alternative cause of Michael's behavior—namely, the onset of his illness— "probable cause does not require police officers to rule out all innocent explanations for a suspect's behavior."[51] Nor does it matter that it was ultimately determined that Michael was not intoxicated at the time

---

[47] *See* Okla Stat. tit. 47 § 11-902(A) (unlawful to operate a motor vehicle while under the influence of alcohol or other intoxicating substances).

[48] *See Rife*, 854 F.3d at 645 ("The 'outward manifestations' of intoxication are 'impaired mental judgment and physical responses.' ") (further citation omitted).

[49] *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) ("As the standard itself indicates, *probable* cause does not require metaphysical certitude or proof beyond a reasonable doubt. '[P]robable cause is a matter of probabilities and common sense conclusions, not certainties.' ") (further citation omitted).

[50] *United States v. Padilla*, 819 F.2d 952, 962 (10th Cir. 1987).

[51] *Rife*, 854 F.3d at 644-45.

-22-

of the arrest.[52]   Based on the uncontroverted facts, Chief Sanders had probable cause to arrest

Michael.  Plaintiff's § 1983 claim for wrongful arrest fails as a matter of law.

**B.      City of Tushka, Oklahoma**

   *1.      Municipal Liability*

   A municipality may not be held liable where there was no underlying constitutional

violation by any of its officers.[53] Because the Court has concluded that Chief Sanders did not

violate Michael's Fourteenth or Fourth Amendment rights, summary judgment is appropriate as to

Plaintiff's claims of municipal liability against the City of Tushka, Oklahoma under 42 U.S.C.

§ 1983.

   *2.      Oklahoma Governmental Tort Claims Act*

   Plaintiff contends that the City is vicariously liable for Chief Sanders' alleged negligence

in failing to ensure Michael received medical treatment.   The Oklahoma Governmental Tort

Claims Act ("GTCA") is the exclusive remedy to recover against an Oklahoma governmental

entity in tort.[54]   Governmental immunity is largely waived under the GTCA, subject to specific

limitations.[55]  "Governmental accountability is extended to torts for which a private person would

be liable, unless they are committed outside of the course and scope of employment or unless they

are committed in bad faith or in a malicious manner."[56]  The common law doctrine of *respondeat*

---

[52] *Sherouse v. Ratchner*, 573 F.3d 1055, 1059 (10th Cir. 2009) ("[A]n officer's reasonable but mistaken understanding of the *facts* justifying a search or seizure does not negate the legitimacy of a probable cause determination.") (emphasis in original).

[53] *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Graves v. Thomas*, 450 F.3d 1215, 1218 (10th Cir. 2006)).

[54] *Tuffy's, Inc. v. City of Okla. City*, 2009 OK 4, 212 P.3d 1158, 1163 (2009).

[55] *Id.*

[56] *Id.*

*superior* remains applicable under the GTCA.[57]  "[R]espondeat superior holds the master liable for injury proximately resulting from the negligent act of a servant done while in the course and scope of the servant's employment with the master."[58]  For present purposes, this means that the City can be held liable for any negligent act of Chief Sanders that proximately caused Michael's injuries and death.

Under Oklahoma law, three elements are required to succeed on a negligence claim: "1) a duty owed by the defendant to protect the plaintiff from injury; 2) a failure to perform that duty; and 3) injuries to the plaintiff which are proximately caused by the defendant's failure to exercise the duty of care."[59]  The City assumes *arguendo* that a Chief Sanders owed Michael a duty of care. It argues, however, that Chief Sanders did not breach that duty and his actions (or inactions) were not the cause of Michael's injuries and death.

The issue of breach is generally a question of fact for the trier of fact.[60]  But where the uncontroverted evidence is such that no reasonable jury could determine that the defendant breached his duty, summary judgment is appropriate.  That is the case here.  Assuming that Chief Sanders owed Michael a duty to protect him, as an arrestee, from injury,[61] he satisfied that duty by presenting him to medical personnel.  It does not matter, as Plaintiff repeatedly contends, that Chief Sanders primarily took Michael to the emergency room to have his blood drawn for a toxicology screen, as it is undisputed that Michael was seen by two medical personnel—a licensed

---

[57] *Id.*

[58] *Fox v. Mize*, 2018 OK 75, 428 P.3d 314, 319 (2018).

[59] *Smith v. City of Stillwater*, 2014 OK 42, 328 P.3d 1192, 1200 (2014).

[60] *Iglehart v. Bd. of Cnty. Comm'rs of Rogers Cnty.*, 60 P.3d 497, 502 (Okla. 2002).

[61] *See Morales v. City of Okla. City ex rel. Okla. City Police Dep't*, 2010 OK 9, 230 P.3d 869, 878 (2010) ("[W]e will assume for purposes of this decision, without deciding, that a police officer owes a negligence-based duty of care to an arrestee to protect the arrestee from injury.").

practical nurse and a registered nurse—who had an independent duty to evaluate him and provide for necessary medical care.  Chief Sanders is not medically trained, and so the extent of his duty was satisfied when he presented Michael to medical personnel.  Contrary to Plaintiff's suggestions, Chief Sanders was under no obligation to "follow up" on any of the specifics of the nurses' vital readings of Michael, as again he is not medically trained.  It was therefore reasonable for him to rely on the nurses' representations that Michael's vitals were within a normal range and he showed no signs or symptoms of distress.

Because no reasonable jury could find that Chief Sanders breached any duty of care he owed to Michael, summary judgment is appropriate on Plaintiff's claims against the City under the Oklahoma Governmental Tort Claims Act.

## C.     Atoka County, Oklahoma Sheriff Tony Head

Plaintiff's claims are brought under 42 U.S.C. § 1983 against Sheriff Tony Head in his official capacity as the Sheriff of Atoka County.  This is "essentially another way of pleading an action against the county" he represents.[62]  Like the City of Tushka, Atoka County cannot be held liable under § 1983 absent an underlying constitutional violation by one of its officers.[63]  Thus, the Court's first inquiry must be whether any of the officers or agents of Atoka County committed an underlying constitutional violation.

### 1.     *Underlying Constitutional Violation*

Plaintiff's claim against Sheriff Head is governed by the same Eighth Amendment deliberate indifference standards laid out above.  At the outset, Sheriff Head does not contest that

---

[62] *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010).

[63] *Hinton v. City of Elwood, Kan.*, 997 F.2d 774, 782 (10th Cir. 1993).

Plaintiff's claim meets the objective prong of the deliberate indifference test. Rather, he argues that none of his officers were subjectively indifferent to Michael's medical needs.

The subjective component of the deliberate indifference analysis requires the Court to consider "evidence of the prison official's culpable state of mind," specifically whether this evidence establishes the official knew of and disregarded "an excessive risk" to the plaintiff's health or safety.[64] Actual knowledge is required; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."[65] A defendant's knowledge can be inferred from circumstantial evidence.[66] "For example, the existence of an obvious risk to health or safety may indicate awareness of the risk."[67]

There is, at the least, a genuine dispute of fact as to subjective awareness of the various jailers as to an excessive risk to Michael's health during his last hours. Several facts cited by Plaintiff would support a reasonable jury's conclusion that the Atoka County prison officials "knew of a substantial risk from the very fact that the risk was obvious."[68] Plaintiff's medical expert testified that "anyone who had occasion to observe Mr. Hoeppner [while he was in the jail] would have known that he was having respiratory difficulties and had a serious medical need." This is corroborated by the observations of inmate Davis, who noted that Michael was "breathing funny" and the Atoka County EMS report which suggests that Michael was having trouble

---

[64] *Id.* (citing *Mata*, 427 F.3d at 751).

[65] *Farmer*, 511 U.S. at 837.

[66] *DeSpain*, 264 F.3d at 975.

[67] *Rife*, 854 F.3d at 647; *see also Farmer*, 511 U.S. at 842 ("[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.").

[68] *Farmer*, 511 U.S. at 842

breathing the night before he died, and that trouble was "dismissed by the jailer on duty." Whether the relevant official is Smith, Nakanashi, or Jackson, each of whom saw Plaintiff, there is a genuine issue for trial as to whether the danger to Michael's health was obvious from his symptoms which, by extension, would indicate awareness of the risk on the part of the jailers. This is sufficient to avoid summary judgment on the issue of an underlying constitutional violation.

2.    *Atoka County Policies or Customs*

Though Plaintiff establishes a genuine issue as to an underlying constitutional violation by one of Sheriff Head's officers, this alone is not sufficient to avoid summary judgment. Sheriff Head is not vicariously liable for the unconstitutional actions of one of his officers.[69] Rather, to hold a county liable under § 1983, Plaintiff must prove "(1) official policy or custom, (2) causation, and (3) state of mind."[70]

The Tenth Circuit has recognized that policies meeting this standard include those "arising from 'a formal regulation or policy statement, an informal custom that amounts to a widespread practice, decisions of municipal employees with final policymaking authority, ratification by final policymakers of the decisions of subordinates to whom authority was delegated, and the deliberately indifferent failure to adequately train or supervise employees.' "[71] Plaintiff asks the Court to find a genuine issue as to whether Atoka County was responsible for "policy or established practice of providing constitutionally deficient medical care in deliberate indifference to the serious medical needs of Jail inmates."[72]

---

[69] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978).

[70] *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1239 (10th Cir. 2020) (alterations and internal quotation marks omitted) (quoting *Burke v. Regalado*, 935 F.3d 960, 998 (10th Cir. 2019)).

[71] *Id.* at 1239-40 (quoting *Pyle v. Woods*, 874 F.3d 1257, 1266 (10th Cir. 2017)).

[72] *Burke v. Glanz*, 2016 WL 3951364, at *23 (N.D. Okla. 2016).

Plaintiff essentially attacks the Sheriff's policies and customs related to the "medical delivery system" at the Jail.  He points out that there are no full-time medical staff at the Jail, though its policies and procedures handbook seems to anticipate at least a "facility physician."  In the absence of such staff, it is the established practice of the Jail to use Atoka County EMS as an alternative.  Whether to call EMS in a particular instance was left to the "common sense" judgments of medically untrained jailers.  Plaintiff further notes that the jailers would sometimes refuse to hand an inmate over to the EMS against medical advice, but this is not relevant to Plaintiff's claims as no such refusal took place here and therefore the jail's alleged custom in such circumstances could not have caused the violation of Michael's constitutional rights.

Plaintiff also notes that the Jail had a custom of violating its own policy, and Oklahoma Jail standards, by failing to conduct hourly sight checks of all cells and inmates.  This is supported by the several deficiency reports issued by the Jail Inspection Division to the Atoka County Jail for this very issue.  This is sufficiently "persistent and widespread" to constitute a custom.[73]

There are, at the very least, genuine issues of material fact that preclude summary judgment on Plaintiff's municipal liability claim against Sheriff Head in his official capacity.  There is sufficient evidence of a custom of insufficient monitoring and supervision of inmates—as shown by the repeated Jail Inspection Division deficiency reports given to Sheriff Head highlighting the failure of jail staff to perform hourly sight checks—and insufficient medical staffing.  The Tenth Circuit has held that each of these might constitute a basis for holding a county liable under § 1983.[74]  Further, Plaintiff has presented evidence that the Jail's practice was essentially to leave

---

[73] *Lankford v. City of Hobart*, 73 F.3d 283, 286 (10th Cir. 1996) (further citation and quotations omitted).

[74] *Lopez v. LeMaster*, 172 F.3d 756, 763 (10th Cir. 1999) ("There is evidence sufficient to survive summary judgment showing that Sheriff LeMaster's failure to provide adequate staffing and monitoring of inmates constitutes

decisions as to an inmate's need for medical care, in the first instance, to medically untrained jailers. These policies are "closely related to the violation of [Michael's] federally protected right"[75] to adequate medical care. As noted above, there is a genuine dispute of fact as to whether jailers completed hourly sight checks for the entirety of Michael's brief stay in Atoka County Jail. And the lack of any medically trained staff at the jail, and the policy to instead rely on medically untrained jailers to decide, in the first instance, if it was necessary to call EMS based only on their "common sense," is "closely related" to the failure to provide medical care that ultimately resulted in Michael's death.

Finally, there is sufficient evidence of Sheriff Head's deliberately indifferent state of mind to avoid summary judgment. "In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it."[76] Put another way, "[t]he deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."[77]

A reasonable jury could find it obvious that placing medically untrained jailers as the gatekeepers for the medical care of inmates presented an obvious risk to inmate health and safety.[78]

---

a policy attributable to the county, and that he was deliberately indifferent to conditions at the jail."), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

[75] *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1241 (10th Cir. 2020) ("For causation, we have explained that 'the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right.'").

[76] *Barney v. Pulsipher*, 143 F.3d 1299, 1308 n.5 (10th Cir. 1998).

[77] *Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1050 (10th Cir. 2022).

[78] *See id.* at 1049 ("Untrained staff completed booking of new inmates, meaning employees with no medical training were tasked with identifying medical conditions.").

Further, asking them to do so—to weed out cases that could wait for a doctor's appointment and to call EMS for emergency situations—on the basis of nothing more than "common sense" could also be reasonably found to be an obvious risk to inmate health and safety.[79]  The is evidence that Sheriff Head, the final policymaker of the jail,[80]  knew that the jail employed no "facility physician," as anticipated by its own policies and procedures handbook, and agreed that the medically untrained jailers should make medical decisions that determined if inmates were to receive immediate care based solely on "common sense."[81]  Accordingly, Sheriff Head is not entitled to summary judgment.

> **IT IS THEREFORE ORDERED** that Defendant Charles Sander's Motion for Summary Judgment (Doc. 134) is **GRANTED.**

> **IT IS FURTHER ORDERED** that Defendant City of Tushka's Motion for Summary Judgment (Doc. 133) is **GRANTED**.

> **IT IS FURTHER ORDERED** that Defendant Sheriff Tony Head's Motion for Summary Judgment (Doc. 136) is **DENIED**.

---

[79] *See id.* ("[U]ntrained jail guards were left to apply their own "common sense" to determine when emergent medical conditions warranted transport to the hospital.").

[80] *See Lopez*, 172 F.3d at 763.  Under Oklahoma law, a county sheriff is in charge of the jail and the prisoners therein. *See* Okla. Stat. tit. 19, § 513; tit. 57, § 47.

[81] *See Tafoya v. Salazar*, 516 F.3d 912, 919 (10th Cir. 2008) ("The knowing failure to enforce policies necessary to the safety of inmates may rise to the level of deliberate indifference." (citations omitted))

**IT IS SO ORDERED.**

Dated this 4th day of October, 2022.


ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE