IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

(1) KARL HOEPPNER, AS SPECIAL    )
ADMINISTRATOR OF THE ESTATE OF)
MICHAEL JAMES HOEPPNER,          )
DECEASED,                        )
                                 )
        PLAINTIFF,               )
                                 )
        vs.                      )   CASE NO. 20-CV-299-RAW
                                 )
(1)TONY HEAD, IN HIS OFFICIAL    )
CAPACITY AS SHERIFF OF ATOKA     )
COUNTY, OKLAHOMA,                )
(2) CITY OF TUSHKA, OKLAHOMA,    )
(3)CHARLES SANDERS,              )
(4)CARRUS HEALTHCARE, LLC, and)
(5)ELIZABETH RAINS, R.N.,        )
                                 )
        DEFENDANTS.              )

DEPOSITION OF

DONNIE LONG

OKLAHOMA CITY, OKLAHOMA

JULY 9, 2021, at 10 A.M.

REPORTED BY DEBRA GARVER, CSR, RPR

Donnie Long                                                July 9, 2021

Page 15

1   downloaded.
2        Q.   Okay.  So explain that to the jury.
3        A.   I requested a copy of the video and was told
4   that the system would not download, therefore, that's
5   why I viewed it there.
6        Q.   So that's why you didn't get a copy of the
7   video?
8        A.   That's why I didn't get a copy, yes.
9        Q.   They were not able to download?
10            MR. SMOLEN:  Object to the form.
11            THE WITNESS:  They were not.
12       Q.   (By Mr. Artus) That's what you were told, and
13  so you sat and watched the video.  Is that correct?
14       A.   I did.
15       Q.   And you noted the pertinent portions from that
16  viewing of the video in your report underneath the
17  interview with Candace Smith.  Is that correct?
18       A.   I did.
19       Q.   And in watching the video, did you notice
20  anything that -- in your experience as a law enforcement
21  officer that looked inappropriate or criminal or wrong
22  in any way?
23       A.   No.
24            MR. SMOLEN:  Object to the form.
25       Q.   (By Mr. Artus) Did it appear to you that

1    inmate Hoeppner, the deceased gentleman, was -- from
2    your viewing the video, did it appear that he was in any
3    kind of distress?
4         A.   No.
5              MR. SMOLEN:  Object to the form.
6         Q.   (By Mr. Artus) Did it appear from watching the
7    video that Mr. Hoeppner went to bed and died sometime in
8    his sleep?
9              MR. SMOLEN:  Object to the form.
10             THE WITNESS:  Yes.
11        Q.   (By Mr. Artus) Could you tell from watching
12   the video at what time he actually died in his sleep?
13        A.   No.
14        Q.   Did you witness anybody banging on the windows
15   or trying to get a jailer's attention prior to
16   Mr. Hoeppner being found dead, try to get his attention
17   to for any reason at all?
18        A.   No.
19        Q.   Did you notice any other inmates trying to get
20   the jailer's attention?
21             MR. SMOLEN:  Object to the form.
22        Q.   (By Mr. Artus) That may have been bad.  Let me
23   start with that first question.
24             First question that I meant to say, I'll say
25   it that way, Mr. Hoeppner, the decedent, did you notice

Page 18

1  cell, could you see jailers going by and checking on
2  him?
3       A.   No.
4       Q.   When he got put in the DOC cell, could you see
5  jailers coming by and checking him?
6            MR. SMOLEN:  Object to the form.
7            THE WITNESS:  I don't recall if anybody was --
8  gone in and checked on him.  I was primarily concerned
9  with if anybody approached him or was in close
10 proximity.  There could have been jailers come in, walk
11 through, I don't recall that.  But nobody approached
12 him, got close enough to him.
13      Q.   (By Mr. Artus) And from the cameras that you
14 were -- you were watching, you were able to see him.  So
15 if a jailer is watching the camera, they would be able
16 to see him if he was -- if he had any kind of distress
17 or something of that nature?
18           MR. SMOLEN:  Object to the form.
19           THE WITNESS:  I can't answer for what they
20 might have seen or couldn't see, but from my view
21 watching the video, if they were in my position, they
22 should have been able to see what I saw.  They would
23 have been able to see him.
24      Q.   (By Mr. Artus) So they could see him lying on
25 the cot and going to sleep, and then you saw nothing

Donnie Long                                                July 9, 2021

Page 19

1   after that to indicate he was -- he was dead.  Right?
2        A.   If they were viewing --
3             MR. SMOLEN:  Object to the form.
4             THE WITNESS:  -- the same position I was at,
5   yes.
6        Q.   (By Mr. Artus) Okay.  From viewing the video,
7   could you tell if he was in any kind of medical distress
8   before he passed away?
9             MR. SMOLEN:  Object to the form.
10            THE WITNESS:  If I could see if he was in any
11  kind of medical distress?
12       Q.   (By Mr. Artus) Yes.
13       A.   I don't believe I would be qualified to answer
14  that because I'm not a --
15       Q.   As a layperson, did you notice anything about
16  it that would alert you that, hey, he's in distress?
17       A.   No.
18            MR. SMOLEN:  Object to the form.
19       Q.   (By Mr. Artus) And as we stated above, he just
20  went to bed and at some point when he was asleep he
21  passed away?
22            MR. SMOLEN:  Object to the form.
23            THE WITNESS:  He did get up a couple times, but
24  the last -- when he laid down the last time, he did not
25  get up again.

Donnie Long                                                July 9, 2021

Page 20

1        Q.   (By Mr. Artus) And from that point forward you
2   couldn't tell when he passed away?
3        A.   Could not.
4        Q.   Did you touch the body or look at the body
5   when you arrived?
6        A.   I looked at it.  I did not touch it.
7        Q.   In your opinion as a OSBI agent, have you seen
8   people who are deceased?
9        A.   Many.
10       Q.   And when you viewed him, was he obviously
11  passed?
12       A.   It appeared.
13       Q.   And had he already been declared dead at that
14  point in time?
15       A.   I would assume so.  I wasn't there when EMTs
16  arrived, so I would -- I don't know when they pronounced
17  him.
18       Q.   Looking at what I've -- we've marked as OSBI 6
19  of the OSBI report, which is Defendant's Exhibit 1,
20  where it says "end note," do you see that?
21       A.   For whose interview?
22       Q.   Candace Smith's.
23       A.   Yes, sir.
24       Q.   Do you see at the end note, it says:
25            At the conclusion of this interview, Smith

Page 21

1        allowed OSBI Special Agent Donnie Long to view
2        the recorded surveillance video from the time
3        Hoeppner was placed in the detox tank until he
4        was removed from the DOC pod after his death.
5           Do you see that?
6     A.    Correct.
7     Q.    And, again, as you stated earlier, you sat
8  there and watched it because they didn't have a way to
9  get it downloaded. Is that correct?
10          MR. SMOLEN: Object to the form.
11          THE WITNESS: Correct.
12    Q.    (By Mr. Artus) And then you have a summary of
13 what you saw. And let's just go through this, shall we?
14    A.    Sure.
15    Q.    The recorded video revealed that Hoeppner was
16 placed in the detox tank about 1036 hours.
17          That would be 10:36 in the morning. Correct?
18    A.    Yes.
19    Q.    And he was alone in the tank. Correct?
20    A.    Correct.
21    Q.    And then he lay on the bed on the tank until
22 he was removed at about 2200 hours. Correct?
23    A.    Correct.
24    Q.    Were you able to see him laying on there?
25    A.    From the report, I was able to -- from memory

Donnie Long                                          July 9, 2021

Page 22

1   a while ago, I was -- I didn't recall watching him in
2   the tank -- in the detox tank, but obviously, from my
3   report, I did that.
4        Q.   So that refreshes your memory?
5        A.   It does now.
6        Q.   Okay.  And then you say he was escorted to the
7   DOC pod at 2211 hours.  That's military time.
8             Is that 10:21 p.m. regular time -- 10:11,
9   sorry, 10:11?
10       A.   Yes.
11       Q.   And the DOC pod is one of the holding cells?
12  Can you describe --
13       A.   It's a larger cell, holds several inmates.
14       Q.   Has several bunk beds in it?
15       A.   Yes.
16       Q.   And I'm sorry, I skipped.  He lay on the --
17  let me go back.
18            He lay on the bed on the tank until he was
19  removed at 2200 hours.  And that would be at
20  10:00 o'clock p.m.  Right?
21       A.   Correct.
22       Q.   And then he was escorted to a telephone where
23  he appeared to make a call.  Is that correct?
24       A.   Yes.
25       Q.   And then he was escorted to the DOC pod at

Donnie Long                                                    July 9, 2021

Page 25

1    Q.   So this would have been the conversation that
2    you were talking about where --
3    A.   Correct.
4    Q.   -- where Davis talked -- appeared to talk to
5    Mr. Hoeppner briefly.  Correct?
6    A.   Yes.
7    Q.   So Davis walked over to the male and he asked
8    him if he was all right, and the male said he was cold.
9    Right?
10   A.   Correct.
11        MR. SMOLEN:  Object to the form.
12   Q.   (By Mr. Artus) And Davis did not have any
13   further conversation with the male.  That's what Shannon
14   Davis testified to you.  Right?
15   A.   Yes.
16   Q.   And just a few minutes later the male lay on
17   his back on his bed, Davis placed a blanket over the
18   male.  Correct?
19   A.   Yes.
20   Q.   And that was the sum total of the conversation
21   that was had with, "Hey, are you all right?"  And he
22   said he was cold.  And that was it.  Right?
23   A.   Yes.
24   Q.   From your investigation.  Is that correct?
25   A.   Yes.

EXHIBIT 7

Donnie Long                                              July 9, 2021

Page 47

1    to the detox tank.
2            Did you see that?
3       A.   Yes.  I saw them leaving the DOC pod.  I don't
4    recall, again, if there was a camera that showed
5    everything on the detox tank, so I can't -- this is what
6    Mr. Jackson told me.  But I did see them escorted out of
7    the DOC pod.
8       Q.   And you saw the EMTs, emergency medical
9    people, come in within six minutes of Mr. Jackson
10   finding Mr. Hoeppner deceased.  Is that correct?
11      A.   Yes.
12      Q.   Going to the next -- so is this a -- anything
13   else you want to add about your interview with
14   Mr. Jackson?
15      A.   No.
16      Q.   And does this conclude all the interviews that
17   you did in your investigation?
18      A.   Yes.
19      Q.   And in your investigation did you come to any
20   opinion or did you have any suspicion that somebody --
21   that anybody in the jail knew that Mr. Hoeppner was in
22   any kind of medical distress and just on purpose didn't
23   do anything?
24           MR. SMOLEN:  Object to the form.
25           THE WITNESS:  I didn't observe anything that

Donnie Long                                              July 9, 2021

Page 48

1   would draw my attention if I was in there, if that's
2   what you're asking.
3       Q.   (By Mr. Artus) Yeah.
4       A.   Nor did I see anybody approach him.
5       Q.   And from doing your investigation, did you
6   find anything that made you want to send this report --
7   do any further investigation or send this report on to
8   the DA for the prosecution of anyone?
9            MR. SMOLEN:  Object to the form.
10           THE WITNESS:  No.
11      Q.   (By Mr. Artus) And then you also received, at
12  the time you talked to William Jackson, a statement that
13  he made.  Is that correct?
14      A.   Yes.
15      Q.   And you attached that to the report?
16      A.   Yes.  The M.E. report, yes.
17      Q.   And then going one page -- OSBI 14, one page
18  back, there is a synopsis where you -- on May 3rd, you
19  received the medical examiner's report from Lisa Barton?
20      A.   Yes.
21      Q.   Did you talk to her at all?
22      A.   No.
23      Q.   Did you review the medical examiner's report?
24      A.   I did.
25      Q.   And then in your report you stated that her

1    was Mr. Hoeppner?
2         A.   Yes.
3         Q.   That was my question.  Maybe identification
4    was too strong of a -- do you see him in the room today,
5    it wasn't that -- I'm not going there.
6         A.   Gotcha.
7         Q.   And at any point in time is he ever off the
8    video screen while in the DOC pod?
9         A.   I don't believe they have one -- I don't
10   recall if it was on the toilet.  I think it was.  But I
11   don't recall if the actual -- I'm pretty sure it was on
12   the toilet as well because I could see him -- yes, it
13   was on the toilet.
14             I saw him go on the toilet and then go to the
15   phone.  So he was never off of the -- off the -- the
16   portion I was able to view, he never left that viewing
17   area.
18        Q.   Okay.  And there was nothing as a layperson --
19   as an OSBI agent for 21 years' experience, there was
20   nothing on that video that jumped out to you or caused
21   you concern based off what you observed?
22        A.   No.
23             MR. SMOLEN:  Object to form.
24        Q.   (By Mr. Rush) Is that true?
25        A.   That's true.

Donnie Long												July 9, 2021

Page 118

1     Q.  And then you said a complete investigation --
2 I wrote this down, and I'm not sure if I got right.  It
3 says:  A complete investigation is where you compile a
4 report, give it to the DA for investigation, and a
5 requester.  And I didn't understand that.
6     A.  And/or the requester.
7     Q.  What is that?
8     A.  Which a requester, whoever requests us to come
9 in and do an investigation, which would have been, in
10 this instance, if this would have been a full
11 investigation, Atoka County Sheriff's Department.
12     Q.  Right.  And if you had thought you needed to
13 do more investigating, you could have done that, right,
14 regardless of what Tony had told you.  Is that right?
15     A.  Yes.
16     Q.  And just to recap, the video that you watched
17 showed Mr. Hoeppner laying down, going to sleep, and
18 dying in his sleep at some point.
19     MR. SMOLEN:  Object to the form.
20     THE WITNESS:  I can't determine if he was
21 asleep or not.  All I can view was he lay down, he
22 didn't get up.
23     Q.  (By Mr. Artus) Gotcha.
24     You didn't see anything that made you think he
25 was in distress, medical or otherwise, prior to his

Donnie Long                                              July 9, 2021

Page 119

1   being found dead the next morning, did you?
2           MR. SMOLEN:  Objection to form.
3           THE WITNESS:  Not from what I observed.
4       Q.  (By Mr. Artus) And did you see anything in the
5   video that made you think that Mr. Hoeppner was in
6   medical distress prior to his death?
7           MR. SMOLEN:  Objection to form.
8           THE WITNESS:  No.
9       Q.  (By Mr. Artus) And was there anything in that
10  video that -- when you watched it, that you thought,
11  uh-oh, this is bad for the jail or this is bad for a
12  jailer or anything like that?
13          MR. SMOLEN:  Objection to form.
14          THE WITNESS:  No.
15      Q.  (By Mr. Artus) And with regard to the inmate
16  you spoke with, you spoke to the inmate who actually
17  spoke with Mr. Hoeppner and put the blanket on him.
18  Right?
19      A.  Yes.
20      Q.  The only one who actually came up to him and
21  spoke to him.  Is that correct?
22          MR. SMOLEN:  Objection to form.
23          THE WITNESS:  Yes.
24          MR. ARTUS:  That's all I have.
25          MR. RUSH:  I don't have any additional

D&R REPORTING & VIDEO, INC.
(800)771-1500 / depo@drreporting.com

EXHIBIT 7

Page 123

1          Do you remember doing that?
2     A.   I did not do that.  That's the medical
3  examiner investigator's duties.
4          So, to answer your question, I don't recall
5  that, no, I'm sorry.  But it would not be me.
6     Q.   And the jailer's name was Mick Nakanashi, is
7  who removed him from detox and put him into DOC.  You
8  never interviewed him.  Correct?
9     A.   Correct.
10    Q.   There's indication from this jailer that there
11 was a conversation with Mr. Hoeppner between a jailer
12 and another inmate when Mr. Hoeppner was on the toilet.
13 Do you recall observing that?
14    A.   I do not, no.
15    Q.   You don't have any reason to dispute it --
16    A.   I don't any reason to dispute it.
17    Q.   -- you don't have an independent memory of it?
18    A.   Correct.
19    Q.   Okay.  And without the benefit of the video,
20 you would need to see that to refresh your memory.
21 Correct?
22    A.   Correct.
23    Q.   Do you recall Mr. Davis telling you that he --
24 Mr. Hoeppner had funny breathing?
25    A.   No.

Donnie Long                                              July 9, 2021

                                                          Page 124

1    Q.  Did Mr. Davis tell you that when Mr. Hoeppner
2    laid down for the very first time that he knew something
3    wasn't right and called jail staff?
4    A.  No.
5    Q.  Did you ever interview Michael Young?
6    A.  No.
7    Q.  He was another inmate who indicated that
8    Mr. Hoeppner had funny breathing while he was in the DOC
9    pod.
10   A.  No.
11           MR. SMOLEN:  That's all I have.
12           MR. ARTUS:  Just have one follow-up question.
13                    FURTHER EXAMINATION
14   BY MR. ARTUS:
15   Q.  In your investigation did anybody tell you
16   that Mr. Hoeppner was screaming?
17   A.  No.
18           MR. ARTUS:  That's all I have.
19           MR. RUSH:  You have the right to read and sign.
20           MS. CONYERS:  We'd like to read and sign.
21           (End of Deposition at 12:29 p.m.)
22
23
24
25

EXHIBIT 7